UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RAUL JORGE DASILVA, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| ANDREW SAUL, | *   Civil Action No. 19-cv-12154-ADB |
| *Commissioner of the Social Security* | * |
| *Administration*, | * |
| | * |
| Defendant. | * |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiff Raul Jorge DaSilva brings this action pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for Social Security Disability Insurance ("SSDI") benefits. Currently pending are Mr. DaSilva's motion to reverse the Commissioner's decision denying his SSDI benefits, [ECF No. 15], and the Commissioner's cross-motion for an order affirming the decision, [ECF No. 20]. For the reasons set forth below, the Court finds that the Administrative Law Judge erred by failing to adequately consider Mr. DaSilva's work-related manipulative activities and therefore GRANTS Mr. DaSilva's motion to reverse, [ECF No. 15], and DENIES the Commissioner's motion to affirm, [ECF No. 20].

I.  **BACKGROUND**

   A.   **Statutory and Regulatory Framework: Five-Step Process to Evaluate Disability Claims**

"The Social Security Administration is the federal agency charged with administering both the Social Security disability benefits program, which provides disability insurance for

covered workers, and the Supplemental Security Income program, which provides assistance for the indigent aged and disabled." Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42 U.S.C. §§ 423, 1381a).

The Social Security Act (the "Act") provides that an individual shall be considered to be "disabled" if he or she is:

> unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3)(A); see also 42 U.S.C. § 423(d)(1)(A). The disability must be severe, such that the claimant is unable to do his or her previous work or any other substantial gainful activity that exists in the national economy. See 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.905.

When evaluating a disability claim under the Act, the Commissioner uses a five-step process, which the First Circuit has explained as follows:

> All five steps are not applied to every applicant, as the determination may be concluded at any step along the process. The steps are: 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920).

**B.     Procedural Background**

Mr. DaSilva applied for SSDI benefits on March 30, 2016, alleging that he became disabled on January 24, 2015 due to a variety of issues with his left eye.[1] [R. 120–21].[2] The Social Security Administration (the "SSA") denied Mr. DaSilva's application on May 25, 2016, [R. 120–26], and again upon reconsideration on December 2, 2016, [R. 127–37]. Thereafter, Mr. DaSilva requested an administrative hearing, and a hearing took place before Administrative Law Judge Sujata Rodgers (the "ALJ") on August 7, 2017. [R. 47–85]. On October 16, 2017, the ALJ issued a decision finding that Mr. DaSilva was not disabled. [R. 141–61].

Mr. DaSilva sought review from the SSA Appeals Council (the "AC"), and, on June 22, 2018, the AC remanded the case. [R. 162–67]. The AC identified a number of errors with the ALJ's decision. [Id.]. First, the ALJ had included a limitation on any work requiring fine manipulation in Mr. DaSilva's residual functioning capacity ("RFC") despite the fact that the record before her did not "contain medical findings that support[ed such] a preclusion." [R. 164]. For that reason, the AC concluded that "[f]urther consideration of [Mr. DaSilva's] ability to [do] work-related manipulative activities [was] necessary." [Id.]. Second, the three jobs that the ALJ cited in the decision—hand packer, kitchen helper, and grocery bagger—had "fingering" requirements which was irreconcilable with the ALJ's finding as to fine manipulation. [R. 165]. On remand, the ALJ was instructed to (1) obtain additional medical

---

[1] Although Mr. DaSilva alleged other medical issues, including depression and shoulder pain, he does not raise arguments about them in connection with his motion to reverse. See generally [ECF Nos. 15-1, 22]. Accordingly, the Court will not discuss them.

[2] References to pages in the Administrative Record, which was filed electronically at ECF No. 10, are cited as "[R. __ ]."

3

evidence, (2) further consider Mr. DaSilva's RFC, especially with respect to "manipulative, work-related activities," and (3) obtain supplemental evidence from a vocational expert. [Id.].

After the remand, the ALJ convened a second hearing on November 26, 2018. [R. 86–119]. Mr. DaSilva, who was represented by counsel, appeared and testified at the hearing, as did vocational expert Dr. Amy E. Vercillo (the "VE").[3] [Id.]. The ALJ issued a decision on December 11, 2018, concluding that Mr. DaSilva was not disabled and therefore not entitled to SSDI benefits. [R. 31–46]. The ALJ's decision became final on August 15, 2019, when the AC denied Mr. DaSilva's request for review. [R. 1–7]. Mr. DaSilva timely filed a complaint with this Court on October 18, 2019, seeking review of the Commissioner's decision pursuant to section 205(g) of the Act. [ECF No. 1].

### C. Factual Background

Mr. DaSilva was born in May 1956; he is currently sixty-four years old and was fifty-nine when he initially applied for SSDI benefits. [R. 39]. He has an eleventh-grade education. [R. 93]. He lives in Dorchester, Massachusetts with his wife, and has two adult children. [Id.]. Between 1989, when he immigrated to the United States, and January 2015, his alleged onset date, he worked consistently. [R. 104]. He held a number of jobs including as an auto salvage technician, a lab technician, and most recently, a school bus driver. [R. 39]. Mr. DaSilva testified that he spends almost all of his time at home, watching television for short periods of time, speaking with friends, and sitting around the house. [R. 98–99]. He testified that he does not help his wife with household chores or shopping but that he "sometimes" drives, within Dorchester, during the day. [R. 94, R. 98–99, R. 106].

---

[3] Dr. Vercillo is incorrectly referred to as "Dr. Versil" in parts of the record. Based on her resume, however, it is clear that her name is Vercillo not Versil. [R. 476].

### D.     Medical Evidence

Mr. DaSilva is essentially blind in his left eye. [R. 95–96]. In December 2014, he experienced a loss of vision and was diagnosed with left eye retinal detachment. [R. 36]. He underwent multiple surgeries, but his condition has not improved. [Id.]. In addition to medical records, the record contains relevant medical opinions from four doctors: Dr. Richard Bird, Dr. Lauren Wright, Dr. Lucy Young, and Dr. Jack Grenier. [R. 38].

Dr. Bird, Mr. DaSilva's primary care physician, [R. 364], offered two opinions. In June 2016, he stated that Mr. DaSilva had lost his vision in his left eye "due to retinal detachment and [has] early signs of vision abnormality in his right eye," "is not able to perform any detailed work, including reading for other than a brief period of time," and that "[a]s a result of his permanent vision abnormalities, it is NOT reasonable to expect that Mr. DaSilva will be able to obtain any employment that will generate an income of at least 80% of his prior income when driving a school bus." [R. 1386]. In November 2018, Dr. Bird opined, among other things, that Mr. DaSilva's vision in his right eye was 20/40 (with a corrective lens), that his vision in his left eye was 20/200 and that, because of his vision issues, he is "totally, and, for the foreseeable future, permanently disabled from any work requiring him to focus in a sustained fashion, to read or to manipulate to perform detailed tasks." [R. 1798].

Dr. Wright completed a form titled "Impairment of Visual Acuity Treating Physician Data Sheet" in July 2017. [R. 1665–70]. She concluded that whereas Mr. DaSilva could "reasonably avoid workplace hazards," he could not "safely work at unprotected heights (e.g., working on a roof, climbing a telephone pole)" or "safely drive large commercial vehicles (e.g., buses, tractor-trailers) or machinery (e.g., bulldozers, forklifts)" without "excessive risk to [him]self or others." [R. 1668].

In September 2018, Dr. Young, an ophthalmologist who examined Mr. DaSilva multiple times, opined, among other things, that Mr. DaSilva is a "monocular patient" for whom she did "not foresee any visual improvement going forward," that "because he does not have depth perception, he cannot resume regular bus driving," that "he should avoid handling power tools and working at elevated places due to his lack of depth perception," and that "[h]is lack of depth perception may also preclude him from performing very delicate manipulative activities as he is unable to distinguish depth." [R. 1792].

In September 2018, Dr. Grenier, an ophthalmologist, completed a "Visual Impairment Information" form. [R. 1794–97]. He concluded that Mr. DaSilva has no near visual acuity in his left eye but that, with correction, his near visual acuity in his right eye was 20/30. [R. 1794]. He also opined that Mr. DaSilva's extraocular movement was "full [without] restriction in any field of gaze." [R. 1795]. His overall conclusion was that the vision in Mr. DaSilva's better eye was too good for him to meet the SSA's statutory requirements for blindness. [R. 1794–97].

### E.   The November 2018 Hearing

On November 26, 2018, the ALJ conducted a hearing at which Mr. DaSilva, his counsel, and the VE appeared. [R. 86–119].

Mr. DaSilva testified first, answering questions from both the ALJ and his counsel. [R. 93–113]. He testified that his vision issues adversely affect his ability to walk, balance, drive, read, look at computer or watch television, and to accomplish tasks requiring fine motor skills (e.g., fitting a screwdriver into a screwhead). [R. 94, R. 96–97, R. 104–08, R. 112]. With respect to reading and looking at screens, he clarified that he can read or look at a screen for only about ten or fifteen consecutive minutes before needing a break. [R. 108–09]. He said that he drives, within Dorchester during the daytime, on occasion. [R. 94, R. 96–97, R. 106]. When

asked if he could perform any of his previous jobs, he said that he could not because of his vision issues.  [R. 111–12].

The VE testified next.  [R. 113–18].  The VE was asked about the kind of work, if any, an individual could perform if that individual had Mr. DaSilva's age, education, and vocational background, could perform work at "all exertional levels," could "never climb ladders, ropes, and scaffolds," must "avoid all exposure to hazards such as heavy machinery, moving mechanical parts, uneven terrain, and unprotected heights," had "no vision in the left eye," could "tolerate work that involves occasional depth perception," could "understand, remember, and carry out simple and routine instructions for two-hour intervals over the course of an eight-hour workday and 40-hour work week, and could "occasionally read and use the computer as a function of the job."  [R. 114–15].  The VE testified that the hypothetical person could not perform any of Mr. DaSilva's previous jobs, [R. 115], but could perform other jobs, identifying, as examples, "sorter," "machine tender," and "machine offbearer and unloader."  [R. 116–17].  When asked whether that same hypothetical person could perform work if that person had "no visual acuity, no depth perception, can less than occasionally handle, finger, and reach in all directions," the VE testified that those limitations would preclude all employment.  [R. 117].  The VE also testified that even if "fingering in [the three] jobs [identified] was occasional," the hypothetical person would be unable to perform them.  [R. 118].

### F.     The ALJ's Decision

On December 11, 2018, the ALJ issued a decision finding that Mr. DaSilva was not disabled under the Act.  [R. 31–46].  Applying the five-step sequential evaluation process for determining whether an individual is disabled, at step one, the ALJ determined that Mr. DaSilva has not engaged in substantial gainful activity since January 24, 2015, Mr. DaSilva's alleged onset date.  [R. 33].  At step two, she determined that Mr. DaSilva's "left eye retinal detachment"

is a "severe" impairment. [Id.]. At step three, she determined that Mr. DaSilva does not have an impairment or combination of impairments that equals a listed impairment. [R. 34–35]. As is relevant here, in making this determination, she considered listing 2.02 (loss of central visual acuity) and concluded that Mr. DaSilva's impairment did not meet the criteria because "his remaining vision in his better (i.e.) right eye after best correction is not 20/200 or less." [R. 34]. Before considering step four of the sequential evaluation process, the ALJ found the following as to Mr. DaSilva's RFC:

> [a]fter careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He can never climb ladders ropes and scaffolds. He must avoid all exposure to hazards such as heavy machinery, moving mechanical parts, uneven terrain and unprotected heights. He has no vision in the left eye. He can tolerate work that involves occasional depth perception. He can understand[,] remember[, and] carry out simple and routine instructions for 2 hour intervals over the course of an 8 hour workday and 40 hour workweek. He can only occasionally read and use a computer as a function of the job.

[R. 35]. The ALJ also wrote that "[p]er the AC's remand order, [she] did not include any limitations relative to fine manipulation in the claimant's residual functional capacity. The AC concluded that 'the record does not contain medical findings that support a limitation on fine manipulation.'" [R. 38 n.1 (internal citations omitted)].

At step four, the ALJ determined that Mr. DaSilva is incapable of performing any past relevant work. [R. 39]. At step five, she found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." [Id.]. Therefore, she found that Mr. DaSilva was not disabled under the Act. [R. 40].

## II.   STANDARD OF REVIEW

This Court has jurisdiction pursuant to section 205(g) of the Act, 42 U.S.C. § 405(g). Section 205(g) provides that an individual may obtain judicial review of a final decision of the

Commissioner of Social Security by instituting a civil action in federal district court. See 42 U.S.C. § 405(g). Under sentence four of section 205(g), the court has the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." Id. A court's decision under sentence four, however, can be based only on a review of the administrative record of proceedings before the Commissioner. See Whitzell v. Astrue, 792 F. Supp. 2d 143, 147 (D. Mass. 2011) (citing 42 U.S.C. § 405(g)).

Under section 205(g), sentence four, this Court's review of the Commissioner's decision is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). In conducting such review, the Court must defer to the Commissioner's factual findings, so long as such findings are "supported by substantial evidence," but the court's review of the Commissioner's conclusions of law is *de novo*. Id.; see also Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ's findings of fact are conclusive when supported by substantial evidence . . . but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts.").

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (alteration in original) (internal quotation marks and citations omitted). The Court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial

evidence." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (citing Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981)).

> Where a court finds that the Secretary has committed a legal or factual error in evaluating a particular claim, the district court's remand order will often include detailed instructions concerning the scope of the remand, the evidence to be adduced, and the legal or factual issues to be addressed. . . . Deviation from the court's remand order in the subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review.

Sullivan v. Hudson, 490 U.S. 877, 885–86 (1989). It is also legal error for an ALJ to disregard an AC remand order. Dacosta v. Berryhill, No. 17-cv-30085, 2019 WL 404039, at *11 (D. Mass. Jan. 31, 2019) ("On remand, an ALJ shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's order." (internal quotation marks omitted)); see also Donna D.A. v. Saul, No. 19-cv-00133, 2020 WL 1317730 (D. Me. Mar. 20, 2020) (remanding because ALJ failed to adhere to AC's remand order), report and recommendation adopted, 2020 WL 2364577 (D. Me. May 11, 2020).

### III.     DISCUSSION

Mr. DaSilva asserts that the ALJ's determination should be reversed because, in denying his application for benefits, the ALJ ignored record evidence. [ECF No. 15-1 at 7]. Specifically, Mr. DaSilva contends that the ALJ disregarded the AC's remand order by failing to consider limitations on his work-related manipulative abilities and ignored the portions of Dr. Bird's and Dr. Young's opinions relevant to that issue. [Id. at 7–8]. The Commissioner concedes that "the ALJ's decision is not perfect" but maintains that it should be affirmed because it is supported by substantial evidence and any error was harmless. [ECF No. 21 at 9–17].

#### A.     The ALJ Erred

As discussed above, an ALJ's failure to comply with a remand order is an independent ground for reversal. See Sullivan, 490 U.S. at 886; Dacosta, 2019 WL 404039, at *11; see also

10

Donna D.A., 2020 WL 1317730; Ellis v. Colvin, 29 F. Supp. 3d 288, 299 (W.D.N.Y. 2014) ("The failure of an ALJ to abide by the directives in an Appeals Council remand order constitutes legal error requiring remand."). In its June 22, 2018 remand order, the AC directed the ALJ to

- [o]btain any additional evidence concerning the claimant's impairments in order to complete the administrative record in accordance with the regulatory standards regarding existing medical evidence[;]

- [g]ive further consideration to the claimant's maximum residual functional capacity, including the claimant's ability to engage in manipulative, work-related activities, and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations[; and]

- [o]btain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base. The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy. Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations.

[R. 165 (citations omitted)]. In short, the ALJ was required to obtain additional medical evidence, reconsider her RFC determination based on the entire record (including the additional evidence), paying special attention to Mr. DaSilva's ability to "engage in manipulative work-related activities," and question the vocational expert accordingly. [Id.]. Instead, in fashioning Mr. DaSilva's RFC, the ALJ stated that she "did not include any limitations relative to fine manipulation in the claimant's residual functional capacity" because "the AC concluded that 'the record does not contain medical findings that support a limitation on fine manipulation.'" [R. 38 n.1]. This statement evidences a misunderstanding of the AC's instructions. When the AC wrote that "the record does not contain medical findings that support a limitation on fine manipulation," it was referring to the record *as it then existed*. [R. 164].

11

Given its instructions to obtain additional evidence and reconsider the RFC, the AC clearly intended for the ALJ to give further thought to the issue, not to treat its order as a statement that no limitations on fine manipulation exist. Even the Commissioner acknowledges that the ALJ disregarded the AC's instructions. [ECF No. 21 at 12]. Thus, the ALJ erred in failing to adhere to the AC's remand order.

### B. The ALJ's Error Was Not Harmless

Even having found error, the Court need only reverse if it finds the error was not harmless. Ward, 211 F.3d at 656 ("While an error of law by the ALJ may necessitate a remand, a remand is not essential if it will amount to no more than an empty exercise." (internal citations omitted)); see Stevenson v. Saul, No. 19-cv-11202, 2020 WL 5821612, at *8 (D. Mass. Sept. 30, 2020) ("Accordingly, even if the ALJ followed the Council's instruction, without more, [the claimant would not have prevailed]. Thus, [the claimant] has not sustained her burden of establishing that the ALJ's failure to comply resulted in harmful error requiring reversal or remand."); see also Colon v. Saul, 463 F. Supp. 3d 66, 74–75 (D. Mass. 2020) (conducting harmfulness analysis in context of failure to comply with remand order) (citing Perez Torres v. Sec'y of Health & Human Servs., 90 F.2d 1251, 1255 (1st Cir. 1989)).

Here, Mr. DaSilva argues that had the ALJ faithfully carried out the AC's order and considered all the evidence in the record—specifically the opinions of Drs. Bird and Young regarding his ability to conduct manipulative work-related activity—she would have found that his ability to manipulate was limited and, given the VE's testimony, that he was disabled from all work. [ECF No. 15-1 at 6–8]. The Commissioner asserts that the error was harmless because any manipulative limitations assessed would have been based on Mr. DaSilva's lack of near visual acuity, which has already been accounted for in the jobs identified by the VE. [ECF No. 21 at 12–13].

Had she considered the issue as the AC directed, based on the opinions of Dr. Bird and Dr. Young, [R. 1792 (Dr. Young), R. 1798–99 (Dr. Bird)], the ALJ could well have concluded that Mr. DaSilva has limitations on his manipulative work-related activities. Dr. Bird opined that "Mr. DaSilva remains, therefore, totally and, for the foreseeable future, permanently disabled from any work requiring him to focus in a sustained fashion, to read or to manipulate to perform detailed tasks." [R. 1798]. Similarly, Dr. Young opined that Mr. DaSilva's "lack of depth perception may also preclude him from performing very delicate manipulative activities as he is unable to distinguish depth." [R. 1792]. The Selected Characteristics of Occupations, a companion text to the Dictionary of Occupational Titles, defines a number of work-related physical demands. U.S. Dep't of Labor, Emp't & Training Admin., Selected Characteristics of Occupations App. C. Physical Demands (1993). Two are particularly relevant here. "Handling" is defined as "[s]eizing, holding, grasping, turning, or otherwise working with hand or hands. Fingers are involved only to the extent that they are an extension of the hand, such as to turn a switch or shift automobile gears." Id. "Fingering" is defined as "[p]icking, pinching, or otherwise working primarily with fingers rather than with the whole hand or arm as in handling." Id. In light of the opinions of Drs. Bird and Young, the ALJ could have concluded that it was appropriate to include a limitation on handling and/or fingering in Mr. DaSilva's RFC.[4]

---

[4] In her decision, the ALJ gave "significant weight" to Dr. Young's opinion but carved out from the opinion Dr. Young's conclusion regarding manipulation seemingly because she misunderstood the AC's remand instructions. [R. 38]. If she had not misunderstood the AC's order, she may have given "significant weight" to Dr. Young's entire opinion. With respect to Dr. Bird, she gave "less weight" to his June 2016 opinion but did not explicitly mention his 2018 opinion. [Id.]. One of the issues that she identified with Dr. Bird's 2016 opinion, that he is not an eye specialist, may have been cured in his 2018 opinion because he explicitly mentions consultation with Dr. Young, an eye specialist. [R. 1798]. Accordingly, it is possible that the ALJ would have credited Dr. Bird's opinion.

Had the ALJ included a limitation on either "handling" or "fingering" in Mr. DaSilva's RFC, it is possible that she would have also found Mr. DaSilva disabled.  Alternatively, the error may in fact be harmless, but the Court is not prepared to find that on the current record.  Therefore, the Court cannot conclude that her error was harmless or that remand would be an "empty exercise."  See Ward, 211 F.3d at 656.  Perhaps most importantly, the ALJ was told by the AC to perform an analysis that she then failed to do for whatever the reason.  The Court ascribes no ill motive to the ALJ but finds that Mr. DaSilva is entitled to the consideration ordered by the AC.

In sum, the ALJ erred by failing to consider Mr. DaSilva's limitations on manipulative work-related activities (i.e., his ability to "handle" and "finger") as she was directed to do by the AC.  Because including a limitation on "handling" and/or "fingering" in her RFC determination may have altered her conclusion that Mr. DaSilva is not disabled, her error is not harmless and remand is appropriate.

## IV.     CONCLUSION

For the reasons stated above, the Court finds that the ALJ erred by failing to consider Mr. DaSilva's manipulation-related limitations as required by the AC's remand order.  Moreover, the Court cannot conclude that the error was harmless.  Therefore, Mr. DaSilva's motion to reverse, [ECF No. 15], is GRANTED and the Commissioner's motion to affirm, [ECF No. 20], is DENIED.  The Commissioner's decision is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion and the AC's previous remand order.

Upon remand, the AC shall assign the matter to an ALJ who has not heard this matter before.  See Muniz v. Berryhill, No. 16-cv-00303, 2017 WL 4083152, at *3 (D.N.H. Sept. 15,

2017) ("In light of the fact that the ALJ has reviewed [the claimant's] case twice, the court believes that this is a case where 'a fresh look by another ALJ upon remand would be beneficial.'" (quoting Simpson v. Colvin, 2 F. Supp. 3d 81, 93 (D. Mass. 2014))).  The AC shall also direct the newly-assigned ALJ to consider the issues raised in this remand as well as the prior remand; to consider and reach an explicit determination regarding Mr. DaSilva's manipulation-related limitations; to evaluate all evidence in the record; and to complete the analysis accordingly.  If warranted, the ALJ shall offer Mr. DaSilva an opportunity for a hearing and take any further action necessary to complete the administrative record prior to resolving the issues discussed above and issuing a new decision.

**SO ORDERED.**

November 17, 2020                                                              /s/ Allison D. Burroughs
                                                                                            ALLISON D. BURROUGHS
                                                                                            U.S. DISTRICT JUDGE